IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLORIA VEGA, HUGO AYALA, PATRICIA )
AYVAR, MARIO DIAZ, FLORA DURAN, )
JUANA FLORES, ROBERTO LOPEZ FLORES, )
ANGELICA GONZALEZ, DANIEL )
GONZALEZ, JOSE   ANTONIO JIMENEZ, )
LINO LANDES, ALICIA LIRA, ENRIQUE )
MARTINEZ, JUANA ORTIZ, RICARDO )
PEREZ, ADELA NERI REYES, REYNALDO )
SALGADO, BENITO A. SILVA, MARTHA )
VARGAS, BERTHA ZAVALA, LUIS )
ZAVALA, VIRGINIA ZAVALA, JUAN )
ESQUIVEL, and LUCRESIA AMADOR )
on behalf of themselves and all others similarly )
situated, )
                                                )
                    Plaintiffs,                 )
                                                )
            v.                                  ) No. 03 C 9130
                                                ) Judge St. Eve
                                                ) Magistrate Judge Bobrick
CONTRACT CLEANING MAINTENANCE, )
INC., CONTRACT CLEANING SERVICES, )
INC., CORPORATE BUILDING SYSTEMS, )
INC., CAROLE BOLTZ, ERIC BOLTZ, )
SARAH ANN BOLTZ, BOLTZ FAMILY )
LIMITED PARTNERSHIP, and UNITED )
PARCEL SERVICE, INC., )
                                                )
                    Defendants.                 )

**FILED**

OCT 2 9 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

DOCKETED

NOV 0 4 2004

NOTICE OF PLAINTIFFS' MOTION
TO PROCEED AS REPRESENTATIVE ACTION

To:     Craig Boggs                          John A. Klages
        Perkins Coie                         Quarles & Brady
        131 S. Dearborn St., Suite 1700      500 W. Madison St.,Suite 3700
        Chicago, IL 60603-5559               Chicago, IL 60661

        Anthony S. DiVincenzo
        DiVencenzo, Schoenfield, & Swartzman
        33 N. LaSalle St, Suite 2900

49

Chicago, IL 60602

PLEASE TAKE NOTICE that on Wednesday November 3, 2004, at 8:45 a.m., the undersigned will appear before the Honorable Amy J. St. Eve in the courtroom usually occupied by her at the United States District Court for the Northern District of Illinois, Eastern Division, and present Plaintiffs' Motion to Proceed as a Representative Action.

Respectfully submitted,

Craig Becker
25 East Washington Street
Suite 1400
Chicago, Il. 60602
(312) 236-4584

Michael A. Caddell
Cynthia B. Chapman
Cory S. Fein
Caddell & Chapman
The Park in Houston Center
1331 Lamar, Suite 1070
Houston, Tx 77010-3025
(713)751-0400

Paul Strauss
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, Il. 60610
(312)751-1170

Sarah Siskind
Miner, Barnhill & Galland
44 E. Mifflin, Suite 803
Madison, Wis. 53703
(608)255-5200

Counsel for the Plaintiffs

2

CERTIFICATE OF SERVICE

I hereby certify that true and correct copy of the foregoing Notice of Motion, Motion to Proceed as Representative Action, Declarations in Support, and Memorandum in Support were served by hand on Craig Boggs, Perkins Coie, 131 S. Dearborn St., Suite 1700, Chicago, IL 60603-5559, Anthony S. DiVincenzo, DiVencenzo, Schoenfield, & Swartzman, 33 N. LaSalle St, Sujite 2900, Chicago, IL 60602, and John A. Klages, Quarles & Brady, 500 W. Madison St., Suite 3700, Chicago, IL 60661 this 29th day of October 2004.

Craig Becker

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GLORIA VEGA, HUGO AYALA, PATRICIA )
AYVAR, MARIO DIAZ, FLORA DURAN, )
JUANA FLORES, ROBERTO LOPEZ FLORES, )
ANGELICA GONZALEZ, DANIEL )
GONZALEZ, JOSE   ANTONIO JIMENEZ, )
LINO LANDES, ALICIA LIRA, ENRIQUE )
MARTINEZ, JUANA ORTIZ, RICARDO )
PEREZ, ADELA NERI REYES, REYNALDO )
SALGADO, BENITO A. SILVA, MARTHA )
VARGAS, BERTHA ZAVALA, LUIS )
ZAVALA, VIRGINIA ZAVALA, JUAN )
ESQUIVEL, and LUCRESIA AMADOR )
on behalf of themselves and all others similarly )
situated, )
)
Plaintiffs, )
)
v. ) No. 03 C 9130
) Judge St. Eve
) Magistrate Judge Bobrick
CONTRACT CLEANING MAINTENANCE, )
INC., CONTRACT CLEANING SERVICES, )
INC., CORPORATE BUILDING SYSTEMS, )
INC., CAROLE BOLTZ, ERIC BOLTZ, )
SARAH ANN BOLTZ, BOLTZ FAMILY )
LIMITED PARTNERSHIP, and UNITED )
PARCEL SERVICE,  INC., )
)
Defendants. )

PLAINTIFFS' MOTION
TO PROCEED AS REPRESENTATIVE ACTION

Plaintiffs hereby move this Court to (1) approve this action proceeding as a representative

action under section 16(b) of the Fair Labor Standard Act (FLSA), 29 U.S.C. § 216(b), and (2)

approve the mailing of the notice attached to Plaintiffs' Memorandum in Support of this Motion

as Exhibit A to potential, opt-in plaintiffs in both English and Spanish.[1]  Plaintiffs propose to

send notice to all persons who worked providing janitorial or maintenance services for CCM or

CCS or any other entity providing janitorial or maintenance services owned or controlled in

whole or in part by any member of the Boltz family, including Howard Boltz, Carole Boltz, Eric

Boltz, Glen Boltz, Cathy Boltz, Sarah Ann Boltz, or any person related to them, within the three

years preceding the mailing of the notice.  Plaintiffs therefore further move this Court to (3) order

Defendants to provide the names and last known addresses and phone numbers of these potential

plaintiffs, specifying their employer, to Plaintiffs within 21 days from the date of the Court's

order.

Respectfully submitted,


Craig Becker                                          Paul Strauss
25 East Washington Street                             Miner, Barnhill & Galland
Suite 1400                                            14 W. Erie St.
Chicago, Il. 60602                                    Chicago, Il. 60610
(312) 236-4584                                        (312)751-1170

Michael A. Caddell                                    Sarah Siskind
Cynthia B. Chapman                                    Miner, Barnhill & Galland
Cory S. Fein                                          44 E. Mifflin, Suite 803
Caddell & Chapman                                     Madison, Wis. 53703
The Park in Houston Center                            (608)255-5200
1331 Lamar, Suite 1070
Houston, Tx 77010-3025
(713)751-0400

Counsel for the Plaintiffs

---

[1]The attached notice is in English only.  If approved, the Plaintiffs will have the notice
translated and obtain the agreement of the Defendants to the translation or, if agreement cannot
be reached, seek Court approval of the translated notice.

2

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

OCT 2 9 2004 *r q*

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| GLORIA VEGA, HUGO AYALA, PATRICIA AYVAR, MARIO DIAZ, FLORA DURAN, JUANA FLORES, ROBERTO LOPEZ FLORES, ANGELICA GONZALEZ, DANIEL GONZALEZ, JOSE ANTONIO JIMENEZ, LINO LANDES, ALICIA LIRA, ENRIQUE MARTINEZ, JUANA ORTIZ, RICARDO PEREZ, ADELA NERI REYES, REYNALDO SALGADO, BENITO A. SILVA, MARTHA VARGAS, BERTHA ZAVALA, LUIS ZAVALA, VIRGINIA ZAVALA, JUAN ESQUIVEL, and LUCRESIA AMADOR on behalf of themselves and all others similarly situated, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) No. 03 C 9130<br>) Judge St. Eve<br>) Magistrate Judge Bobrick |
| CONTRACT CLEANING MAINTENANCE, INC., CONTRACT CLEANING SERVICES, INC., CORPORATE BUILDING SYSTEMS, INC., CAROLE BOLTZ, ERIC BOLTZ, SARAH ANN BOLTZ, BOLTZ FAMILY LIMITED PARTNERSHIP, and UNITED PARCEL SERVICE, INC., | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

DOCKETED
NOV 0 4 2004

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION
## TO PROCEED AS REPRESENTATIVE ACTION

Plaintiffs have moved this Court to approve this action proceeding as a representative

action under section 16(b) of the Fair Labor Standard Act (FLSA), 29 U.S.C. § 216(b), and to

approve the mailing of notice to potential, opt-in plaintiffs. Plaintiffs propose to send notice to

all persons who worked providing janitorial or maintenance services for CCM, CCS, or any other



entity providing janitorial or maintenance services owned or controlled in whole or in part by any member of the Boltz family, including Howard Boltz, Carole Boltz, Eric Boltz, Glen Boltz, Cathy Boltz, Sarah Ann Boltz, or any person related to them, within the three years preceding the mailing of the notice.[1]

ARGUMENT

I.  Notice is Necessary in Representative Actions Under the FLSA

Section 16(b) of the FLSA authorizes a plaintiff to bring an action on "behalf of himself and other employees similarly situated." 29 U.S.C. § 216(b). Federal courts, including the Seventh Circuit, have recognized that this language "authorizes a representative action" under the FLSA. See Woods v. New York Life Ins. Co., 686 F.2d 578, 580 (7th Cir. 1982). However, section 216(b) further provides that no person can participate in such a representative action "unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." In other words, unlike in a Rule 23 class action, each plaintiff must opt into an FLSA representative action. Furthermore, the filing of a complaint styled as a representative action does not toll the running of the statute of limitations for unnamed parties. Rather, the statute continues to run until they file written consent to join the action with the court. See 29 U.S.C. § 256(b).

For this reason, the federal courts have held that it is appropriate in FLSA actions for the plaintiffs, with court approval, to give potential plaintiffs notice of their right to opt into the

_____

[1] Plaintiffs intend at a later time to move for class certification under Rule 23 in relation to all the non-FLSA claims stated in the Complaint.

2

action. "Congress has stated its policy that ADEA [and FLSA[2]] plaintiffs should have the opportunity to proceed collectively." Hoffman-LaRoche Inc. v. Sperling, 493 U.S. 165, 170 (1989). In addition, "The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." Id. But this opportunity cannot be taken advantage of and these benefits gained without notice. "These benefits, however, depend on employees receiving accurate and timely notice concerning the pendency of the collective action, so that they can make informed decisions about whether to participate." Id. This "allows persons less likely to be aware of the suit, or to sue themselves, to receive notice and decide whether to opt in at an early stage." O'Brien v. Morse, 2002 U.S.Dist.LEXIS 10495 at *3 (N.D.Ill. 2002).

## II. Notice Must be Timely

Courts have held that such notice should be given at "an early stage" of the litigation. O'Brien at *3. This is critical because, unlike under Rule 23, the filing of a representative action does not toll the running of the statute of limitations on the claims of any but the named plaintiffs. The statute is not tolled for other similarly situated employees until their signed consent form is actually filed with the Court. See 29 U.S.C. § 256(b); Harkins v. Riverboat Services, Inc., 2002 U.S.Dist.LEXIS 19637 at *6 (N.D.Ill. 2002). Thus, it is essential that notice be "timely." Hoffman-LaRoche, 493 U.S. at 170.

This is particularly true in this case, involving low-wage, unskilled workers, because delay in the giving of notice will almost certainly lead to a high percentage of the notices being

---

[2]The ADEA incorporates the procedures specified in § 16(b) of the FLSA, see 29 U.S.C. § 626(b), as explained in Woods, 686 F.2d at 579.

3

returned marked undeliverable.  The Plaintiffs in this case are janitors and high turnover rates in

the janitorial industry are well-documented.  The national turnover rate for janitors is

approximately 250% annually, meaning employers hire 2.5 employees for each position each

year.  See Cleaning Firms Accept Union's Model Contract, St. Louis Post-Dispatch, Feb. 26,

2002, C1.  See also High Cost of Turnover, Cleaning Maintenance and Management Magazine,

Sept. 2003 ("turnover of 200-300 percent is typical of the industry") (both attached).  This means

that the average tenure for each janitor is less than five months.  For this reason, the Defendant-

Employers' last-known addresses for many potential plaintiffs will not have been updated

recently because the potential plaintiffs no longer work for the employer.  This is of critical

significance because low-wage, unskilled workers like janitors are also highly mobile.  The

Census Bureau found that 16.1% of Americans moved between 1999 and 2000 and that the rate

of movement was higher among people with lower income (21% among people with household

income under $25,000 and 28% among those with income below the poverty level).  U.S. Census

Bureau, Geographical Mobility: Population Characteristics 2, 4-5 (May 2001) (attached).  In

addition, Hispanics have the highest rate of movement of any ethnic group, id. at 4, and the

employees at issue here are almost exclusively Hispanic.  See Third Amended Complaint ¶ 4; all

declarations except Sampson.  Thus, delay in the sending of notice in this case will effectively

prevent many potential plaintiffs from receiving the notice because the list of potential plaintiffs

who Plaintiffs will be unable to locate is growing each day.  In effect, delay will prevent potential

plaintiffs from opting in and thus will defeat the purpose of section 16(b).

III.  Standards Governing Approval of Notice

The standards governing the decision to approve notice under section 216(b) are different

4

from the standards of Rule 23 applicable to class actions. This is because, unlike any of the forms of class action provided for in Rule 23, a section 216(b) representative action requires that each individual affirmatively opt into the action. Thus, even if notice is approved, no person will be party to the action or be bound by its outcome without his or her affirmative, written consent. For this reason, "The 'similarly situated' standard under § 216(b) is less stringent than the requirements under Federal Rule of Civil Procedure 23(b)(3)." Bontempo v. Metro Networks, 2002 U.S.Dist.LEXIS 11810 at *5 (N.D.Ill. 2002). See also Vazquez v. Tri-State Management Co., 2002 U.S.Dist.LEXIS 385 at *6 (N.D.Ill. 2002); O'Brien, 2002 U.S.Dist.LEXIS 10495 at *3; Karlin v. City Colleges of Chicago, 1985 WL 1165 at *2 (N.D.Ill. 1985). Moreover, "[i]f, after discovery the court determines [those who have opted in] are not 'similarly situated,' it can take remedial action at that time." O'Brien, 2002 U.S.Dist.LEXIS 10495 at *3.

This Court has described the showing necessary to merit notice as a "modest factual showing." Bontempo, 2002 U.S.Dist.LEXIS 11810 at *5-6. See also Vazquez, 2002 U.S.Dist.LEXIS 385 at *9. Under the FLSA, this Court has held, "the representative need only show that the plaintiffs are similarly situated." Bontempo, 2002 U.S.Dist.LEXIS 11810 at *2. This standard is met if the plaintiff makes "a modest factual showing sufficient to demonstrate that plaintiff and potential plaintiffs together were victims of a common policy or plan that allegedly violated the FLSA." Id. at *5-6.

IV. Notice is Appropriate in this Case

In this case, the Plaintiffs allege that the Defendants developed and implemented a scheme to misclassify janitorial and maintenance employees as independent contractors and thereby deny them compensation at the required time and one-half rate for overtime hours and,

when they were forced to reclassify workers as employees, continued to deny them overtime compensation by misstating their hours. Plaintiffs have presented declaration evidence from two managers who themselves implemented both aspects of this scheme and a large number of employees in both Illinois and Texas who were subject to both aspects of this scheme.

Declarant Bruce Sampson worked for both CCM and CCS for almost ten years. Sampson dec. ¶ 2. When he began working for the cleaning operation in Texas it was called CCM and it later changed its name to CCS. Id. He moved up from the position of machine operator to manager. Id. At the end of his employment, he worked directly under Defendant Eric (Rick) Boltz who oversaw all operations in Texas. Id. At that time, Sampson managed the operations in 34 UPS facilities in Texas. Id. Sampson supervised approximately 200 janitors at any given time at these sites. Id. ¶ 6. The declaration of this high level manager, working directly under the owner and boss and supervising over 30 worksites, establishes the generality of the unlawful policies and practices alleged in the Complaint.

First, Sampson states that it was the "policy" of both CCM and CCS "to classify all our janitors as independent contractors." Id. ¶ 3. This policy was followed "unless we were pressured to change them to employees," for example, when "the manager of a worksite we were cleaning would require that we classify our janitors as employees." Id. Sampson states specifically that he informed new janitors that they were independent contractors "as I was instructed to do by Rick Boltz." Id. ¶ 9. Indeed, when Sampson himself started work for CCM, he was told he was an independent contractor. Id. ¶ 2.

Second, Sampson states that the actual relationship between the janitors and CCM and CCS was one of employment and not independent contract:

9. The janitors working under my supervision performed basic unskilled janitorial work. They were not required to, nor did they, maintain any type of licensing or certification. They were told which days they were required to work and they were required to report to work at a certain time on each work day, and were required to work until a certain time each work day. They had no flexibility regarding the hours they worked. I assigned janitors to specific tasks such as sweeping the floors and cleaning the restrooms. I instructed janitors what equipment they should use in performing their assigned tasks, how to use the equipment and gave them a detailed work procedure schedule which they were required to follow.

10. I inspected the janitors' work and if it was not being done adequately I instructed them to correct it and told them how to do so. The janitors were subject to close supervision by me (and at times by employees of the companies whose site we were cleaning) while they were working and they took directions from me during the work day.

11. The janitors were not allowed to hire their own assistants and they had no opportunity for profit or loss from their work. Janitors were hired with the expectation that they would work on a continuing basis for extended periods of time and many of them worked continuously for several years. Janitors did not, and were not expected to, bring their own equipment or supplies to the jobs they worked. CC provided them with the equipment and supplies they needed for the job.

. . . .

5. . . . . . The janitors played no role in the purchase of any tools, supplies or equipment which they used.

Id. ¶¶ 9, 10, 11, 5. When a client demanded that CCM or CCS reclassify janitors as employees,

CCM or CCS did so, but with no change in the reality of the relationship. Sampson states:

Some CC clients, for example Texas Utilities (which contracted with CC for the cleaning of its Comanche Peak power plant site), required CC's janitors to be classified as CC employees rather than as independent contractors. When a client enforced this policy, CC complied without making any changes to the reality of the relationship. In other words, janitors classified as independent contractors performed the same work under the same working conditions and had the same relationship to CC as did janitors who, because of a demand from a CC client, were classified as CC employees.

Id. ¶ 16.[3]

_____

[3]Thus, Sampson's declaration and each of the other declarations makes clear that all of the criteria that must be examined indicate that the relationship was one of employment and not

Third, Sampson states that the janitors who were wrongly classified as independent contractors routinely worked more than 40 hours per week and were not paid at a rate of one and one-half times their regular rate for the overtime hours. Sampson states:

> I have personal knowledge that most of the janitors who worked under me regularly worked more than 40 hours per week and received no overtime pay. . . . Because turnover was relatively high, and I worked at [CCM and CCS] for several years, I supervised more than a thousand janitors during my employment . . . and none of them were ever paid overtime despite the fact that most regularly worked more than 40 hours per week.

Id. ¶ 6.

Finally, Sampson states that CCM and CCS misstated janitors' hours in order to avoid paying for overtime at the required rates even when the janitors were classified as employees. Id. ¶ 7.

Sampson confirms that this set of unlawful policies and practices existed at all CCM and

_____

independent contract. In Secretary of Labor v. Lauritzen, 835 F.2d 1529 (7th Cir. 1987), cert. denied, 488 U.S. 898 (1988), the Seventh Circuit set forth six criteria that should be considered in order to classify a worker as an employee or independent contractor under the FLSA. They are:

> 1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;
> 2) the alleged employee's opportunity for profit or loss depending upon his managerial skill;
> 3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
> 4) whether the service rendered requires a special skill;
> 5) the degree of permanency and duration of the working relationship;
> 6) the extent to which the service rendered is an integral part of the alleged employer's business.

Id. at 1535. In addition, the Court focused on the economic dependence of the workers on the alleged employer. Here, as in Lauritzen, the janitors "clearly are dependent on the [employer] in order to survive economically" as evidenced by their continued work for the employers on a full-time, continuous basis. Id. at 1538.

CCS worksites and applies to all janitorial personnel. In addition to the 34 sites he supervised directly, Sampson states that he visited work sites all over Texas and found that these unlawful policies and practices "were standard at all [CCM and CCS] work sites." Id. ¶ 15. He also confirms that these policies and practices were standard in other states where Boltz family janitorial enterprises operated.

> [CCM and CCS] also operated in Illinois, Colorado, Mississippi and California, although perhaps under different names. The California operations were run by Rick Boltz's sister, who ran [CCM's and CCS'] Texas operations before Rick took over. Based on conversations with managers in those states, I believe the employment practices I have described above also existed in those states.

Id. ¶ 17.

Plaintiffs have also submitted a declaration from Joe Canales. Canales rose to the level of Project Manager working first for CCM and then CCS in Texas, supervising approximately 10 locations and 60-80 janitors. Canales ¶¶ 3, 7. Like Sampson, he was both subject to the unlawful policies and practices and later implemented them.

First, when Canales began work for CCM he was informed that he was an independent contractor. Id. ¶ 4. He was also directed to sign a form so stating. Id. ¶ 19. Later, as a manager, Canales states, "When new janitors were hired to work under my supervision, I told them that they were being hired as independent contractors as I was instructed to do by Rick Boltz." Id. ¶ 6.

Second, Canales confirms that the actual relationship between CCM and CCS and the janitors was one of employment. He describes his relationship to CCM and CCS both before he became a manager and his relationship to janitors after he became a manager. Id. ¶¶ 8-13, 20-31. Along every relevant dimension, the relationship was one of employment. In fact, Canales

9

explains that after five years of working for CCM and then CCS, he was told that his status was changed from that of an independent contractor to that of an employee. Id. ¶ 4. However, he states, "There was no change in my job duties or relationship to [CCM/CCS] when [CCM\CCS] changed by designation from independent contractor to employee." Id. Like Sampson, Canales states that when a client insisted that CCM or CCS classify the workers as employees, CCM and CCS complied but without changing the "reality of the relationship." Id. ¶ 17.

Third, Canales confirms that janitors wrongly classified as independent contractors, including Canales himself, routinely worked more than 40 hours in a week, but were not paid at a rate of one and one-half times their regular rate for the overtime hours. Id. ¶¶ 5, 32-34.

Finally, Canales confirms that these unlawful policies and practices "were standard at all the CCS work sites" – "approximately 30-50 sites in the State of Texas" where CCS "employed approximately 300 janitors at any one time." Id. ¶ 16.

This testimony from these high-level managers is confirmed by many rank-and-file janitors in both Illinois and Texas. Plaintiffs have submitted declarations from 16 janitors who worked at various work cites for CCM in Illinois: Ayala, Diaz, Duran, Jimenez, Landes, Lira, Martinez, Ortiz, Perez, Reyes, Silva, Vargas, Vega, B. Zavala, L. Zavala, V. Zavala, and two janitors who worked at various cites for CCM and CCS in Texas: Esquivel, Amador. These declarants worked as janitors for CCM and CCS for periods of time ranging from more than 10 years to less than one year. See, e.g., Silva ¶ 2; Lira ¶ 2. They worked at many different work sites, including UPS' Hodgkins sorting facility, O'Hare Airport, several furniture and other stores in Illinois, and UPS facilities in Texas. Duran ¶ 3; Perez ¶¶ 3, 4; Silva ¶¶ 3, 4; Esquivel ¶ 3; Amador ¶ 3. Each declarant confirms the wide-spread, indeed uniform, nature of each element

10

of the unlawful scheme described by managers Sampson and Canales.

First, the declarations all state that the janitors were told by CCM agents that they were independent contractors. For example, Hugo Ayala states:

> When I began work for CCM, I was told by the CCM supervisor of my shift, Luis Iracheta, that I was an independent contractor. I was also directed to sign a form that stated that I was an independent contractor. I did not know the legal definition of an independent contractor and did not fully understand the form that I was directed to sign.

Ayala ¶ 4. Moreover, the pay stubs of the declarants confirm this misclassification. For example, Gloria Vega's stubs from August, September and October 2001 designate her as a "Subconractor." Vega Exhibit 1. They further reveal that no payroll taxes were deducted from these workers' compensation as is required for all employees by both federal and state law. Vega Exhibit 1, 2. In fact, CCM has admitted in its Answer that it told plaintiffs that they were independent contractors, asked them to sign an independent contractor agreement, and deducted no payroll taxes from their payments. CCM Answer ¶¶ 57, 94, 58, 67.

Second, the declarations all describe a working relationship that was clearly one of employment and not independent contract. They all describe, simple, unskilled work. For example, Hugo Ayala states, "my duties consisted of sweeping and mopping the floors." Alyala ¶ 8. Mario Diaz states that during the week his duties were "sweeping, moping, cleaning the bathrooms, taking out all garbage and cleaning anywhere I was told to." Diaz ¶ 8. Alicia Lira states, "my duties consisted of cleaning the restrooms and changing garbage bags." Lira ¶ 8.[4]

---

[4]The declarations also describe a variety of noncustodial tasks performed for UPS, such as testing conveyor belts and building boxes. See, e.g., Perez ¶ 11. Because the question of whether UPS was the joint employer of these workers is not at issue here, this evidence is not described in the text.

All the workers describe close supervision. They indicate that CCM employed a manager and supervisors at the Hodgkins facility and designated lead workers on each crew. Martinez ¶ 9. The same was true for CCS in Texas. Esquivel ¶ 8; Amador ¶8. For example, Diaz states:

> My work was supervised by supervisors employed by CCM. On the day shift it was Everton Cesaroto and on the night shift Luis Iracheta. The supervisors told me what part of the facility I should work in each day and what I should do. They oversaw my work and told me if they believed I was not doing it correctly. CCM also designated workers as leaders in each crew.

Diaz ¶ 9.[5] In fact, several of the declarants became supervisors and provided this close supervision to others. Esquivel ¶ 19. And all confirm that none of the other indicia of independent contractor status were present. For example, Flora Duran states:

> 5. CCM assigned me to work at the Hodgkins facility. CCM told me to report for work at a specific time and to leave work at a specific time.
> 6. CCM required that I sign in and out and punch in and out.
> 7. CCM paid me on an hourly basis. First I was paid $6.00, then $6.50 per hour.
> . . . .
> 11. I did not have any form of specialized training for working with the conveyor belts and did not have any certificate or license to work on them. I was asked by Maria Nagera to sign a document that said I had received a training on how to clean and polish the conveyor belts.
> 12. I did not supply any of the equipment, tools, or supplies I used on the job.
> 13. I was not allowed to hire or bring with me any assistants to perform my job.
> 14. I did not make any investment in the job and had no opportunity for either profit or loss from the job.
> 15. I worked for CCM on a full-time, continuous basis.
> 16. I did not maintain my own janitorial business. I did not work for other janitorial companies. I did not have my own customers.
> 17. CCM would sometimes take workers from the Hodgkins facility and take them to another location to work.

---

[5]The declarations also describe direct supervision by UPS supervisors. See, e.g., Ayala ¶ 9; Perez ¶ 10; Silva ¶ 11; Vargas ¶ 10. This evidence is not described in the text for the reason stated in note four.

Duran.

Third, the declarations all state that the janitors routinely worked more than 40 hours in a week and were not paid at a rate of one and one-half times their regular rate for the overtime hours. For example, Alicia Lira states:

> 16. I always worked for CCM six days per week at the Hodgkins facility. My regular hours were 10 p.m. to 6 a.m. Monday through Friday and 5 a.m. to 1 p.m. on Sunday.
> 17. I regularly worked more than 40 hours per week.
> 18. I was not paid at a rate of one and one-half times my regular rate for hours that I worked in excess of 40 in any week.

Lira. This remained true even for the limited number of janitors whose designation was changed from independent contractor to employee. For example, Esquivel states:

> 20. In 1997, CCS changed my classification from independent contractor to employee. There was no change in my actual relationship to CCS.
> 21. I typically worked for CCS from 3 a.m. to 2 p.m. Monday through Friday and an additional six hours on Sunday. I regularly worked for more than 40 hours in a week.
> 22. I was not paid at a rate of one and one-half times my regular rate for hours that I worked in excess of 40 in any week.
> 23. Despite the fact that I routinely worked over 40 hours per week, my pay stubs always showed that I had worked 80 hours every two weeks.

Esquivel.

Finally, the declarations all state that at the multiple locations where these janitors worked, on the different shifts they worked, and within the different work crews with which they worked, these unlawful policies and practices were applied to all the hundreds of janitors working for CCM and CCS. For example, Benito Silva states:

> 25. Janitors working for CCM worked at the Hodgkins facility on three shifts, 24 hours per day Monday through Saturday and for one shift on Sunday. I estimate that over 100 janitors were employed by CCM at the facility at any one

time.

26. I worked in several different locations, on several different shifts, and with several different work crews during my over 10 years with CCM. Based on my conversations with other janitors and observation of their work, I believe that all the janitors employed by CCM at the Hodgkins facility and at other locations were treated as I have described in paragraphs four through 24 above.

Silva.

These declarations provide much more than the required modest factual showing that the workers were similarly situated. This Court has repeatedly held, "[P]articipants in the lawsuit need only be "similarly situated,' not identical." Karlin, 1985 WL 1165 at *2. "The plaintiffs in a § 216(b) class action . . . need not show that their positions are identical, but only that they are similar." Allen v. Marshall Field & Co., 93 F.R.D. 438, 443 (N.D.Ill. 1982).[6] Plaintiffs have clearly satisfied these standards.

## V. The Proposed Notice is Proper

Plaintiffs have attached the notice they intend to mail to this Memorandum as attachment A.

The notice that is mailed under section 16(b) does not come from the Court or the Defendants. It is the Plaintiffs' notice. This Court has recognized that then notice is "a communication from the plaintiff and plaintiffs' counsel to other prospective class members." King v. ITT Continental Baking Co., 1986 U.S.Dist.LEXIS 29321 at *6-7 (N.D.Ill. 1986). Therefore, "plaintiffs should be allowed to use the language of their choice in drafting the notice." Id. at *6. "The Court has both the power and they duty to ensure that the notice is fair and accurate, [but] that power should not be used to alter plaintiffs' proposed notice unless such

---

[6] Of course, differences in the damages suffered by potential plaintiffs are not relevant at this stage of the proceedings. Allen, 93 F.R.D. at 443.

alternation is necessary." Id. at *7. "There are myriad minor variations in the presentation of information that might make a difference to the parties in the case. . . . The only thing that matters to the Court is that the notice of lawsuit and consent form convey accurately and fairly all the necessary information at this stage." Heitmann v. Chicago, 2004 U.S.Dist.LEXIS 14669 at *10 (N.D.Ill. 2004). Even if the notice does not include information that "the Defendant believes is important," it may be "neither false nor misleading" and thus perfectly proper. Id. at *6. If the notice fairly and accurately "explains the Plaintiffs' view of [the subject employment practices] in plain and simple terms . . . . [n]othing further is required." Id. at *7.

Attachment A is fair and accurate. Its mailing should therefore be approved.

Conclusion

For the above-stated reasons, this Court should (1) order Defendants to provide the names and addresses of potential plaintiffs to Plaintiffs and (2) approve the sending of the notice attached hereto as Exhibit A to those potential plaintiffs.

Respectfully submitted,

Craig Becker
25 East Washington Street
Suite 1400
Chicago, Il. 60602
(312) 236-4584

Michael A. Caddell
Cynthia B. Chapman
Cory S. Fein
Caddell & Chapman
The Park in Houston Center
1331 Lamar, Suite 1070

Paul Strauss
Miner, Barnhill & Galland
14 W. Erie St.
Chicago, Il. 60610
(312)751-1170

Sarah Siskind
Miner, Barnhill & Galland
44 E. Mifflin, Suite 803
Madison, Wis. 53703
(608)255-5200

15

*See Case File for Exhibits*