IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GLORIA VEGA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) No. 03 C 9130 | |
| v. ) | |
| ) The Honorable Amy J. St. Eve | |
| CONTRACT CLEANING MAINTENANCE, ) | |
| INC.; et al., ) Magistrate Judge Nan R. Nolan | |
| Defendants. ) | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF PARTIAL CLASS ACTION SETTLEMENT AGREEMENT

Plaintiffs submit this memorandum in support of their motion, pursuant to Federal Rule of Civil Procedure 23(e), for final approval of the parties' partial class action settlement agreement on behalf of all persons who performed janitorial and/or maintenance work in Illinois for CCM between December 18, 1998 and December 31, 2003 (hereinafter, collectively, "the Illinois Class" or "Illinois Class Members"), certification of the Class, and approval of the parties' negotiated fee award.

Plaintiffs Gloria Vega and Adela Neri Reyes commenced this action against Contract Cleaning Maintenance, Inc. (CCM) on December 18, 2003, seeking unpaid overtime under the federal Fair Labor Standards Act (FLSA) on behalf of themselves and others who had performed janitorial and maintenance work for CCM in Illinois. During two and a half years of litigation, the lawsuit expanded to add nearly 150 additional opt-in plaintiffs (in Texas as well as Illinois), eight defendants, and additional claims under state and federal law based on allegations that the defendants (1) deliberately misclassified their janitors as independent contractors; and based on that misclassification, (2) refused to pay their janitors overtime, and made unlawful deductions from the janitor's pay. To preserve parallel, class-wide claims for unpaid overtime under Illinois law, plaintiffs Paula Ponce, *et al.*, filed a companion lawsuit in Cook County Circuit Court, *Ponce, et al. v. CCM, et al.*, No. 05 CH 07529, on behalf of an Illinois-only class. (Siskind Decl.

at ¶2)

The proposed Settlement (Id., Att. A), negotiated at arms length under the supervision of Magistrate Judge Nolan, was reached on August 29, 2006. (Siskind Decl., ¶¶3, 6) It settles all claims of the Illinois Class arising out of work performed for CCM in Illinois.[1] (Id. at ¶3)

Under the Settlement, the defendants collectively agreed to pay into a Settlement Fund, for distribution to the Illinois Class by an impartial administrator, a minimum of $525,000, plus an additional $2,500 (to be paid by defendant UPS) for each claiming class member in excess of 50, up to a maximum of $1,125,000, plus up to $100,000 for the costs of class notice and settlement administration, plus $800,000 to reimburse plaintiffs' attorneys for the fees and costs incurred in pursuit of the settled Illinois claims. As the Settlement Administrator has validated claims for 131 claimants (including the claims of the named plaintiffs), defendants' total contributions to the Settlement Fund are $727,500 ($525,000 plus $2,500 times the 81 claims validated in excess of 50). And as plaintiffs show below, this total will yield settlement awards to each claimant of more than 160% of the value of his or her claims for unpaid overtime, liquidated damages, unlawful deductions from their pay for putative insurance, and interest for delayed payment. (Id. at ¶¶3, 7, 12-15)

Plaintiffs and their counsel recommend the Settlement as an excellent resolution for the Illinois Class – a resolution to which not a single class member has objected – and request that the Court approve it. The history of the litigation and mediation, description of the settlement terms, and grounds for approval are set forth below.

---

[1] The settlement also resolves various cross-claims among the defendants and third-parties insofar as they arise out of work performed in Illinois (see n. 2) and, with respect to defendants CCM and the Estate of Carole Boltz, requires the dismissal of all claims, including RICO claims arising from work performed by the Texas plaintiffs for CCS (not CCM) in Texas. (CCM did not operate in Texas.) After consultation with Magistrate Judge Nolan, plaintiffs' counsel have written the approximately 90 Texas opt-in plaintiffs to inform them that their claims against the CCM defendants (CCM) and the Estate of Carole Boltz are being dismissed, given (1) counsel's determination that pursuit of these claims (after settlement of the Illinois claims) was not a wise expenditure of resources given these claims' relative weakness in contrast with the strong unsettled claims still being pursued against CCS (the Texas company) and its owners; (2) the fact that CCM is no longer a functioning company and has no assets; and (3) the death of Carole Boltz during the course of litigation and her Estate's extremely limited assets. None of the Texas opt-in Plaintiffs objected to the dismissals. (Id. ¶3)

2

## I.    History of the Litigation

On December 18, 2003, Plaintiffs Vega and Reyes filed a single-count FLSA complaint against a single defendant, CCM, for failure to pay required overtime hours worked over 40 hours a week. A series of amendments over two and a half years culminated in an Eighth Amended Complaint filed on July 14, 2006 making claims on behalf of both Illinois and Texas plaintiffs under the federal FLSA, 29 U.S.C. §201, *et. seq.*, the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §1961 *et seq.*, the Employee Retirement Income Security Act (ERISA), 29 U.S. §1001, and the state laws of Illinois and Texas. (Id. at ¶2)

The core claims on behalf of the Illinois Class were that (1) defendants misclassified plaintiffs as independent contractors and misrepresented their hours of work to evade defendants' legal obligations under employment and tax laws and (2) defendants unlawfully deducted money from plaintiffs' pay, thereby converting plaintiffs' property to their own dominion and control. (Id. at ¶2) In addition to adding nearly 150 new plaintiffs (52 of them from Illinois, the rest from Texas), plaintiffs' amendments added eight defendants (Contract Cleaning Services, Inc. (CCS), Corporate Building Systems, Inc. (CBS), UPS, Eric Boltz, Sarah Boltz, the Estate of Carole Boltz, Randy Sanders, and Helen Braddock.)[2] (Id.)

The litigation was hotly contested leading up to this Settlement (as it continues to be with respect to the Texas claims). The defendants filed five substantive motions to dismiss. They vigorously opposed plaintiffs' motions to proceed as a representative action, to send supplemental notice, and to add plaintiffs who opted in after Notices were issued. They put up strong resistance to plaintiffs' discovery, forcing plaintiffs to file two sets of motions to compel discovery from CCM and three from CCS; and, when direct discovery from defendants proved insufficient, to serve over 70 subpoenas on government agencies and third parties. Defendant UPS, named as the joint-employer of the defendant cleaning companies (CCM, CBS and CCS), aggressively pursued all avenues of defense, as well as taking the lead with respect to many of the motions described and, collectively with the other corporate defendants, directing more than

---

[2]    Various defendants filed cross-claims against each other. CCM and CCS filed cross-claims against the Estate of Carole Boltz, Eric Boltz and the Boltz Family Limited Partnership and a third party complaint against the Estate of Howard Boltz. UPS filed cross-claims and third party claims against defendants CCM, CBS, CCS, Randy Sanders,

3

25,000 individualized discovery requests to the opt-in plaintiffs. (Id. at ¶4)

By the end of 2005, plaintiffs had obtained sufficient discovery to assemble a payroll database identifying approximately 800 Illinois Class Members and providing the information they needed to evaluate defendants' liability. Proving liability, however, would have required thousands of hours of additional work (*e.g.*, establishing the relationships among CCS, CCM and CBS, the liability of individual defendants, UPS's status as joint employer, and the collectability of any judgment from the non-UPS defendants, such as CCM). Indeed, when the parties commenced mediation in late 2005, deposition discovery on these issues had not yet been authorized by the Court. Not only were the risks of not proving UPS's liability as joint employer and/or finding any judgment not collectible from the non-UPS defendants significant, but also it was inevitable that the process of completing discovery, litigating class certification, trial and appeal would, absent settlement, have delayed any class recovery for many years. (Id. at ¶5)

## II.   The Mediation

Once the parties agreed to mediation in late 2005, the process proceeded under intensive supervision by Magistrate Judge Nolan. After full briefing, all counsel and all parties (including representatives of the plaintiffs and representatives of all of the defendants other than the Estate) met with the Judge for a first session on March 16, 2006. The session lasted 12 hours devoted exclusively to negotiations over the merits of the Class Claims. The parties did not reach agreement that night, but they did settle the Illinois claims at a second session held in late April 2006, at which the Magistrate Judge put the agreement on the record and, having resolved the merits of the class claims, directed the parties to turn to the issue of attorneys' fees and costs. This issue was taken up and resolved at a third and final substantive session in May 2006. The written terms sheet was executed on July 11, 2006; but it took until August 29, 2006 for the parties to finalize, and execute, the Stipulation of Settlement. (Id. at ¶6)

---

Estate of Carole Boltz and the Boltz Family Limited Partnership, as well as against Aramark, a third party. (Id.)

### III.    The Terms of Settlement and the Claims Process

The Settlement requires defendants to pay a minimum amount of $525,000 to the Settlement Fund, and an additional $2,500 for each valid claim filed in excess of 50. All costs of administration up to $100,000, and attorneys' fees and costs in the amount of $800,000 are to be paid by defendants over and above these payments to the Class Plaintiffs.

As required by the Settlement and this Court's preliminary approval order, the Settlement Administrator mailed a class notice explaining the terms of the settlement and claims procedure (in English and Spanish) to all known class members at their last known addresses. (Dkt. 382, Order Granting Preliminary Approval Exhibit A; Dkt. 424, Status Report)  Additional short-form notice (to the predominantly Spanish speaking class members) was broadcast on Spanish language radio and published in the local press. (Dkt. 424)  And the Administrator mailed notices to class members who requested their notices in response to the radio and publication ads and, for those to whom updated addresses were obtained by skip-searching in response to the return "undeliverable" of original notices by the Postal Service. (Dkt. 424; id. at ¶7)

Ultimately, claims from 131 class members (including the named plaintiffs) were validated by the Claims Administrator.  Only three class members asked to be excluded. (Dkt. 424, Status Report)  (A fourth individual who requested exclusion asserted that he had never worked for CCM, and is hence not a member of the class.)  (Siskind Decl. at ¶8)  No objections were filed. (Id.)

In August 2006 (as required be the Terms Sheet and even before execution of the final Settlement Stipulation), all defendants remitted their respective shares of the first $525,000 required by the Settlement Agreement to the Claims Administrator, who deposited the monies in an interest bearing Escrow Account.  Following the completion of the claims process, defendant UPS paid an additional $202,500 ($2,500 for each of the 81 claims in excess of 50).  Exclusive of interest on the escrowed monies (which has accrued and will continue to accrue until the monies are distributed) the total Settlement Fund now holds the full $727,500 in escrow pending the distribution to the Class. (Id. at ¶9)

The Settlement allocates $60,000 of these funds for incentive bonuses of $3,000 to each

5

of 20 plaintiffs who actively participated in the lawsuit through written discovery and/or participating in the mediation. Settlement, Article 9.11. This leaves $667,500 to be distributed among the 131 validated claimants identified on the Claims Administrator's Amended Modified Claims List (Dkt. 446, Status Report). (Id. at ¶10)

To effectuate this distribution, Class Counsel's data consultant calculated claim values for each of the claimants on the Claims List (Dkt. 446) according to the formula set out in the Settlement at Article 9.11. (Siskind Decl. at ¶11; Soule Decl. ¶¶4-9)  That is, he calculated, based on time, tax and payroll records for the period in which computer-readable time or payroll records exist, for each claiming class member, a damages amount equal to two times the amount claimed as the Class Member's unpaid overtime for the period dating back to December 18, 2000; plus one times the amount claimed as the money deducted from the Class Member's wages for "insurance" dating back to December 18, 1998; plus claimed interest at the historic prime rate the Class Member could have earned had his or her wages been paid twice per month instead of once per month dating back to December 18, 1998. (Id.)  For all claiming class members' claims based on the period before computer-readable time or payroll records exist, and for class members who verified their employment but for whom no records existed in the computer readable time or payroll records, he allocated a lump sum equal to the average overtime worked in 2001 for each year in which the Class Member worked, with the same sum being paid to each class member for work performed during each such year. (Siskind Decl. at ¶12; Soule Decl. at ¶5)

Based on these assumptions, Mr. Soule calculated an individualized damage total for each claimant by dividing that amount by the sum of all Claiming Class Members' claims, he determined each individual's percentage share of the Settlement Fund. (Siskind Decl. ¶13; Soule Decl. at ¶10)  The amount of each claimant's actual award from the fund will be calculated, finally, by multiplying the percentage share by the total funds available for distribution (or the $667,500 plus interest accrued as of the distribution date).  The table attached to Mr. Soule's

declaration makes a provisional calculation of these awards (exclusive of the still- accruing interest) for the Court's approval. (Siskind Decl. at ¶13; Soule Decl., Exhibit A)[3]

The aggregate value of each claiming class member's claim thus equals $417,262. (Id at ¶15; Soule Decl. at ¶10) The $667,500 in the Settlement Fund (exclusive of the $60,000 for bonuses and also interest that will have been earned on the Settlement monies from the date of deposit to the distribution date) is equal to 160% of that aggregate value. (Siskind Decl. at ¶15) Every claiming class member thus will receive 160% times the total of his/her actual losses, plus liquidated damages and interest, with attorneys' fees, the bonus payments, and costs of administration paid on top of that. (Id.)

Attorneys' Fees and Litigation Expenses. Subject to the Court's approval, the Settlement also requires defendants to pay attorneys' fees and expenses of $800,000. This fee provision was negotiated only after the merits of settlement for the class were resolved at the third and final mediation session. (Id. at ¶16) At this third session, Class Counsel submitted to Magistrate Judge Nolan a full set of time records detailing all work they performed and expenses incurred in the prosecution of the settled Illinois claims. (Work devoted exclusively to pursuit of the Texas claims was separately identified, and excluded.) These submissions showed that, as of the mediation, the firms' respective lodestars for their work devoted to the Illinois claims (and excluding all time devoted to Texas), based on the firms' hourly rates in effect in early 2006, were as follows:[4]

---

[3] Pursuant to Settlement Art. 9.12, Class Counsel mailed individualized notices prepared from Mr. Soule's database (id. at ¶11) to each claimant, indicating the claimant's percentage share of the settlement fund and the work history information on which the percentage share calculations were based. The notices allowed time for submission of documentation supporting the correction of these histories in cases where the claimant believed they were inaccurate. (Siskind Decl. at ¶14) Only one request has been received with documentation showing additional work performed during the covered period. It was received just today, after the deadline set by the notice. Class counsel intend nonetheless to make the correction indicated; but they are confident that it is small enough that it will not susbtantially change the allocation for the claimants overall. (Id.) If counsel are wrong, they will advise the Court. (Id.)

[4] Id. Att. A shows, for each firm, the total number of hours worked by each lawyer (or paralegal), that individual's 2006 hourly rate, and the total dollars attributable to that individual's work. Time records detailing the tasks performed and the dates they were performed over the two and a half years leading up to the mediation were produced and reviewed with Magistrate Judge Nolan. At the defendants' request (for reasons related to the allocation of time between the Illinois and Texas parts of the case) the Magistrate has retained possession of these records. (Id. at ¶16 If the Court wishes an independent review, they, or copies, will be provided.

| | |
|---|---:|
| Becker | $399,900.00 |
| Caddell Chapman | 57,695.50 |
| Gillespie Rozen | 10,978.75 |
| Altshuler Berzon | 213,226.50 |
| Janet Herold | 44,505.00 |
| Miner Barnhill & Galland | 270,816.50 |
| | |
| Fees as of May 2006 | $997,124.25 |
| Costs as of May 2006 | 68,349.74 |

(Id.) Thus, the $800,000 negotiated award amounts (after subtracting the reimbursed costs) amounts to an award of only $731,650.26 for fees, and thus reflects a discount of more than $265,000 (or more than 25% of the $997,124.25 lodestar) from counsel's actual attorneys fees and costs as of the mediation submission.

The discount is even steeper when the additional time spent on (1) negotiating the terms of the formal Settlement; (2) moving for preliminary approval; (3) administering notice and the claims process (including calculating the individual claims amounts); and (4) moving for final approval is included in the total lodestar, as follows:

| | |
|---|---:|
| Becker | $ 23,452.00 |
| Miner Barnhill & Galland | 73,159.40 |
| | |
| Total Fees 5/16/06 to date | $ 96,611.40 |

Id., Att. B. Taking this additional uncompensated time into account increases the discount to more than $360,000 (or almost 33% of the updated lodestar of $1,093933.65). (Id. at ¶17) The negotiated award of 67% of counsels' lodestar, for achieving a settlement that will pay claiming class members 160% of the value of the class members' claims, is surely reasonable.

## ARGUMENT

### I.    The Legal Standard for Approval

Rule 23(e) of the Federal Rules of Civil Procedure provides in relevant part that "[a] class action shall not be dismissed or compromised without approval of the Court, and notice of the proposed dismissal or compromise...given to all members of the class in such manner as the

Court directs." The Court may approve the settlement "after a hearing and on a finding that the settlement...is fair, reasonable, and adequate."

Court approval is a two-step process. *Armstrong v. Board of School Directors,* 616 F.2d 305, 314 (7th Cir. 1980); *see also Alaniz v. California Processors, Inc.*, 73 F.R.D. 269, 273 (N.D.Cal. 1976); *In re NASDAQ Market-Makers Antitrust Litig.,* 176 F.R.D. 99, 102 (S.D.N.Y. 1997); *In re Bromine Antitrust Litigation*, 203 F.R.D. 403, 416 (S.D.Ind. 2001); *In re Holocost Victim Assets Litigations*, 105 F.Supp.2d 139, 144 (E.D.N.Y. 2000). The first involves a "preliminary" evaluation to determine whether a proposed settlement is within the "range" of "possible" approval. *Id.* Its limited purpose is "to ascertain whether there is any reason to notify the class members of the proposed settlement and to proceed with a fairness hearing." *Armstrong*, 616 F.2d at 314. The second step is taken at the fairness hearing, where the court hears any objections to the settlement from Class members and argument as well as evidence bearing on whether the proposed settlement is "fundamentally fair, adequate, and reasonable." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir.), *cert. denied,* 506 U.S. 953 (1992) (quoting *Officers for Justice v. Civil Serv. Comm.,* 688 F.2d 615, 625 (9th Cir. 1982), *cert. denied sub nom., Byrd v. Civil Serv. Comm.*, 459 U.S. 1217 (1983).

In the present case, preliminary approval was granted on September 18, 2006 (Dkt. 382) and the Class Notice issued on October 2, informing class members of their right to submit objections and present them at the fairness hearing on March 1, 2006. (Mt. Final App., Exhibit A, Ex. 5) No objections were filed and only three prospective class members opted out. (Siskind Decl., at ¶3, Dkt. 427) This reaction from the class, and the terms of the settlement itself, are strong support for final approval.

## II.    The Proposed Settlement is Fair, Reasonable, and Adequate

The proposed settlement is the result of the lengthy, arms-length negotiations between experienced litigators under the supervision of the Magistrate Judge, after extensive informal and formal discovery. The settlement provides substantial, certain, and immediate monetary benefit to claiming class members in proportion to their injuries, without the delay, burden, or the risks

of further litigation. Indeed, the payment to each claimant will substantially exceed the value of the claims (non-RICO, non-punitive damage) (i.e., it will equal at least 160% of that value). ("[O]ne must ask whether the value of relief in the aggregate is a reasonable approximation of the value of plaintiffs' claim." *Uhl*, 309 F.3d at 987, (quoting *In re Mexico Money Transfer Litigation*, 267 F.3d 743, 748 (7th Cir. 2001)). The release required from the Class, moreover, is properly limited to claims accrued as of settlement that were or could have been asserted in either the state court *Ponce* case or the federal court *Vega* case. And the distribution formula is fair. The Class Members will be paid in proportion to individual unpaid overtime and deductions to the extent that available records permit, after allocation of bonus payments of $3,000 to 20 plaintiffs who assisted actively in the litigation.[5]

## III. The Proposed Attorneys' Fees and Costs Are Also Fair And Reasonable.

Finally, the negotiated attorneys' fees and costs are also reasonable. The $800,000 amount was negotiated at arms length, under the supervision of Magistrate Judge Nolan, separate from the Class Fund, and only after negotiations over the class recovery terms was completed. Indeed, after subtracting reimbursed costs, the negotiated fee is 25% less than counsel's actual Illinois lodestar incurred through the date of the mediation, and even more substantially less (33%) than class counsel's collective Illinois lodestar as of the date of this motion.

## IV. Certification Of The Illinois Class Is Warranted.

Finally, as this Court must find in order to approve any settlement under Rule 23, certification of the settlement class (consisting of all persons who performed janitorial and/or maintenance work in Illinois for CCM between December 18, 1998 and December 31, 2003) is appropriate. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 630, 117 S.Ct. 2231, 138 L.Ed.2d

---

[5] These service enhancements are also fair and reasonable, as these plaintiffs' efforts were essential to plaintiffs' overall success for the Class as a whole (Siskind Decl. at ¶10), and their bonus payments comprise a small fraction (8%) of the Settlement Fund. *See, e.g., Huguley v. General Motors Corp.*, 128 F.R.D. 81, 85 (E.D.Mich. 1988), *aff'd*, 925 F.2d 1464 (6th Cir.), *cert. denied*, 502 U.S. 909 (1991); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685 (N.D.Ga. 2001) (quoting *In Re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 273 (S.D.Ohio 1997); *VanVranken v. Atlantic Richfield Co.*, 901 F.Supp. 294, 300 (N.D.Cal. 1995); *Green v. Battery Park City Authority*, 44 Fair Empl. Prac. Cas. (BNA) 623, 625, 627 (S.D.N.Y. 1987).

10

689 (1997); *Retired Chicago Police Assoc. v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993); *Uhl v. Thoroughbred Technology and Tile Company*, 309 F.3d 978, 985 (7th Cir. 2002). Indeed, as this Court has already found in connection with preliminary approval, class certification is straightforward.

Numerosity Under Rule 23(a)(1). The numerosity requirement is met if "the class is so large that joinder of all members is impracticable." Fed.R.Civ. P. Rule 23(a)(1). As they had informed this court in their motion for preliminary approval of the Settlement, Class counsel had anticipated that between 100 and 200 of a class of approximately 1,000 janitors identified in CCM's payroll records would submit settlement claims – and 131 did. These numbers are easily sufficient to satisfy the numerosity requirement. *Perez-Funez v. District Director, I.N.S.*, 611 F.Supp. 990, 995 (C.D.Cal. 1984) (25 class members sufficient); *Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir. 1984), *cert. denied*, 470 U.S. 1028 (1985) (46-60 person class certified); *Aguirre v. Bustos*, 89 F.R.D. 645, 647-48 (D.N.M. 1981) (60-100 farmworkers); *Rodriguez v. Carlson*, 166 F.R.D. 465, 471-72 (E.D.Wash. 1996) (100 farmworkers). *See also Leyva v. Buley*, 125 F.R.D. 512, 515 (E.D.Wash. 1989), and *Rodriguez v. Berrybrook*, 672 F.Supp. 1009, 1017 (W.D.Mich. 1987) (joinder impracticable regardless of numbers, class members are immigrants with limited education, facility English language, familiarity with the legal system or access to lawyers).

Commonality and typicality under Rule 23(a)(2) & (3). The common questions requirement for class certification is also met. Here, the Court has already found that all of the janitors "were victims of a common policy or plan that violated the law." *See* January 31, 2005 Order Granting Plaintiffs' Motion to Proceed as a Representative Action, Dkt. 86) Plaintiffs' evidence supporting that finding establishes both commonality (as proof of the unlawful misclassification, failure to pay overtime, and unlawful deductions will be common across the class) and typicality (as the representative plaintiffs' claims are based on the same legal theories as the class claims overall) under both Rule 23 (a)(2) (*see Rosario v. Livaditis*, 963 F.2d 1013, 1017-18 (7th Cir. 1992), *cert. denied*, 506 U.S. 1051 (1993) (common nucleus of operative fact is usually enough) and Rule 23(a)(3) (*see De La Fuente v. Stokely-Van Camp., Inc.*, 713 F.2d 225,

233 (7th Cir. 1983) (typicality exists where the plaintiffs' claims arises from same course of conduct that gives rise to class claims and are based on same legal theory); *Rodriguez v. Carlson*, 166 F.R.D. 15 472; *Aguirre v. Bustos*, 89 F.R.D. at 648; *Rodriguez v. Berrybrook Farms*, 672 F.Supp. at 1016-17.

Adequacy of representation under Rule 23(a)(4). The "adequacy" requirement is also satisfied, as the course of litigation has shown that the named plaintiffs have vigorously represented the interests of the Class; no conflicts exist; and plaintiffs' counsel are experienced litigators with expertise in employment and class action litigation who have worked diligently on behalf of this class. Fed.R.Civ.P. Rule 23(a)(4). *See Uhl*, 309 F.3d 978; *Wetzel v. Liberty Mut. Ins. Co.*, 508 F.2d 239, 247 (3rd Cir. 1975), *cert. denied*, 421 U.S. 1011 (1975); *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994); *Hanlon*, 150 F.3d 1911, 1020 (9th Cir. 1998).

Rule 23(b)(3). Finally, Rule 23(b)(3) is also satisfied, because common questions (*e.g.*, whether the janitors were misclassified as independent contractors, whether the misclassification was intentional, whether they are in fact employees, whether they were paid at the required rate for overtime work, whether the deductions from their pay for "insurance" were unlawful) plainly "predominate over any questions affecting only individual members." Rule 23(b)(3). "[T]he group aspiring to class status is seeking to remedy a common legal grievance.'" *Lockwood Motors, Inc. v. General Motors Corp.*, 162 F.R.D. 569, 580 (D.Minn. 1955)(quoting 3B Moore's Federal Practice §23, 45[2] at 23-306 to 23-307 (2d ed. 1995)).

Further, this class resolution is, equally plainly, "superior to other available methods for the fair and efficient adjudication of the controversy." "When common questions represent a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." *Wright, et al., supra.*, §1778. The superiority of a class action in this case is apparent. Conducting this case as a class action avoids duplicative discovery procedures, disputes among counsel, repeated adjudication of similar controversies, and excessive costs. *See De La Fuente*, 713 F.2d at 233; *Lerwill*, 582 F.2d 507, 512 (9th Cir. 1978)(Class action was superior means of resolving overtime pay claims where "[n]umerous individual actions would be

expensive and time-consuming and would create the danger of conflicting decisions as to persons similarly situated"). The overall question of defendant's liability overshadows any individual damages issues. *Rodriguez v. Carlson*, 166 F.R.D. at 479; *Salazar-Calderon v. Prsidio Valley Farmers Ass'n*, 869 F.2d 384, 389 (5th Cir.), *cert. denied*, 493 U.S. 821 (1989); *see also Haywood v. Barnes*, 109 F.R.D. at 583; *De La Fuente*, 713 F.2d at 233; *Lockwood Motors*, 162 F.R.D. at 581-82. Class certification is plainly warranted.

## V. The Class Notices Provided Adequate Notice of the Settlement to the Class.

Before the Court can consider final approval of the Settlement, the Class must be given notice "reasonably calculated, under all circumstances, to apprise [them] of the [settlement] and afford them an opportunity to present their objections." *Mendoza v. United States*, 623 F.2d 1338, 1350-51 (9th Cir. 1980)(quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). The mail notice approved by the Court upon preliminary approval informed the class of all relevant terms of the settlement, including how to file a claim, opt out, or object. (Mt. Final App., Exhibit A, Ex. 5) It was mailed to all Class Members in two languages at their last known addresses, and then re-mailed to new addresses found through the Administrator's skip search and the publicity generated by the supplemental radio and print notices. (Id., Exs. 6, 7)

## CONCLUSION

Based on the foregoing and the entire record, the Settlement should be approved. It provides substantial monetary relief in excess of actual losses to class members without the burden, delays, and risks of further litigation. Plaintiffs respectfully request therefore that the Court enter the proposed order granting final approval of the Settlement as follows:

(a) determining that the certification of the Illinois Class was appropriate for purposes of effectuating the Settlement Agreement;

(b) approving the Settlement as fair, reasonable, adequate and in the best interests of the Illinois Class;

(c) excluding from the Class the three individuals who requested to be excluded;

13

(d)    approving, for purposes of calculating and making distributions under the terms of this Settlement Agreement to the individuals on the Amended Modified Class List, the amount of each share for each individual (exclusive of interest) listed on Exhibit A to the Declaration Whitman Soule;

(e)    approving incentive awards in the amount of $3,000 to each of the 20 individuals listed on Exhibit 2 of the Settlement Agreement;

(f)    approving the payment to Class Counsel attorneys' fees and costs and expenses in the amount of $800,000; and

(g)    providing for dismissal of plaintiff's Illinois claims in the form attached to the Settlement Agreement as Exhibit 3.

Dated this 22nd day of February, 2007.

Respectfully submitted,

/s/ Sarah E. Siskind
Sarah E. Siskind

Sarah E. Siskind
Miner, Barnhill & Galland
44 East Mifflin Street; Suite 803
Madison WI 53703

Craig Becker
25 East Washington Street
Suite 1400
Chicago IL 60602

Laura Juran
Michael Rubin
Altshuler, Berzon, Nussbaum,
   Rubin Demain
177 Post Street, Suite 300
San Francisco CA 94108

14